189 Cal.App.4th 126 (2010)
116 Cal. Rptr. 3d 677
BENJAMIN, WEILL & MAZER, Plaintiff and Respondent,
v.
NANCY HURWITZ KORS, Defendant and Appellant.
No. A125732.
Court of Appeals of California, First District, Division Two.
October 12, 2010.
*128 Gary Steven Garfinkle and Maria Garfinkle for Defendant and Appellant.
Benjamin, Weill & Mazer, Andrew J. Weill, David R. Benjamin and Kenneth D. Schnur for Plaintiff and Respondent.

OPINION
KLINE, J.
The California Arbitration Act (CAA) requires that "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" be timely disclosed to all parties (Code Civ. Proc., § 1281.9, subd. (a).)[1] The issue in *129 this case is whether this requirement may include business relationships with persons or entities that are not parties or lawyers for parties in the subject arbitration and, if so, whether such relationships should have been disclosed by the arbitrator here.
Appellant Nancy Hurwitz Kors appeals from an order granting the petition filed by respondent law firm, Benjamin, Weill & Mazer, a professional corporation (BWM), to confirm an arbitration award, and denying her petition to vacate that award. The order must be reversed, she claims, because the chief arbitrator failed to disclose business relationships casting doubt on his ability to be impartial, as required by the CAA. (§ 1281.9, subd. (a).)
We agree that in the circumstances of this case the arbitrator's business relationships "could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" (§ 1281.9, subd. (a)), which is all that is necessary to create the duty to disclose them. Accordingly, we shall reverse the order appealed from.

FACTS AND PROCEDURAL HISTORY

The Arbitration
In June 2004, Kors, a psychologist who serves as a professional adoption facilitator, was sued by Alette and Robert Temple after they learned that the putative birth mother they met through Kors had feigned her pregnancy and defrauded them out of several thousand dollars. In December 2004, Kors retained BWM to represent her. Five months later, after the parties clashed over a series of discovery and other disputes, the Temples voluntarily dismissed their complaint against Kors without prejudice. Kors thereafter filed a motion for an award of $224,564.74 in legal fees and costs under Family Code former section 8635, asserting that, by virtue of the dismissal, Kors was the prevailing party for purposes of that section. The trial court disagreed and denied the motion, and that ruling was affirmed by Division One of this court. (Temple v. Kors (Aug. 29, 2006, A112619) [nonpub. opn.].)
Kors had at that time paid BWM $227,537.75 in legal services and costs, but had failed to pay the balance of $68,986.38 she had been billed by the firm. In March 2006, BWM served on Kors a notice of client's right to arbitration under the Mandatory Fee Arbitration Act (MFAA) (Bus. & Prof. Code, § 6200 et seq.). Instead of responding to that notice, Kors applied for nonbinding fee arbitration under the MFAA pursuant to rules of the Contra *130 Costa County Bar Association (CCCBA). BWM objected on the jurisdictional ground that no attorney who provided services to the parties in the lawsuit brought by the Temples against Kors ever maintained an office in Contra Costa County, and also because Kors's fee agreement with BWM specified that any fee dispute between the parties was to be submitted to binding arbitration pursuant to the rules of The Bar Association of San Francisco (BASF). The CCCBA denied jurisdiction and BWM thereupon commenced this action.
After the action was filed, Kors requested the binding arbitration under the BASF rules specified in the parties' fee agreement. (BASF Attorney/Client Fee Dispute Program, Arbitration Rules of Procedure (rev. Apr. 30, 2007) (BASF rules).) When BWM refusedon the ground that Kors's effort to commence nonbinding arbitration pursuant to the rules of the CCCBA "specifically waives any belated request for binding arbitration at this time" Kors moved to enforce the arbitration agreement and stay BWM's action. On September 28, 2007, the trial court granted Kors's motion to compel arbitration. Concluding that Kors's refusal to respond to BWM's notice of right to arbitrate under the MFAA resulted only in a waiver of her right to nonbinding arbitration under that law, and she retained her right to enforce the parties' agreement for binding contractual arbitration under the BASF's rules and procedures for the arbitration of fee disputes, the court directed the parties to promptly submit their dispute to the BASF for binding contractual arbitration pursuant to that organization's rules.[2]
In December 2007, the BASF appointed a panel of three arbitrators, Sean M. SeLegue, Gregory S. Maple and Clement D. DeAmicis, designating SeLegue chief arbitrator.[3] Under BASF's rules, the chief arbitrator "shall be responsible for the conduct of the arbitration and the writing of the Arbitration Award." (BASF rule 7(D).) Also, the chief arbitrator "shall be the sole *131 judge of the relevance of any offered evidence and the hearing procedures employed." (BASF rule 9(E).)
Although the panel heard the matter on September 4, 2008, it did not issue its decision until February 25, 2009, 175 days later. The panel found "that the total amount of fee and/or costs which should have been charged in this matter is $303,579.34, of which the client has paid $227,537.75, for a net amount of $76,041.59 in unpaid fees and costs." (Fn. omitted.)[4] Kors was also directed to pay $26,245.80 in accrued interest, so that the total award to BWM was in the amount of $102,287.39. Together with the previously paid $227,537.75, the total cost to Kors of BWM's representation was $329,825.14 plus accruing interest on the unpaid portion. Although the 20-page arbitration award acknowledged Kors's timely complaints that the aggressive strategy BWM devised was costing more than she was able to pay, and she was afraid to tell the partner of the firm representing her that he "was on the wrong course," because she feared "`he would go ballistic,'" the award nevertheless concluded that "while the overall total of BWM's fee claim does indeed seem high, the fees are not out of character with the stakes or the complexity of the legal and factual issues . . . . Dr. Kors persisted in her quest against the Temples even as BWM warned Dr. Kors that she was digging herself in deeper with no guarantee of a fee recovery from the Temples."
On February 25, 2009, BASF mailed Kors the award together with a notice that she had 100 days within which to request that the award be vacated or corrected, as required by section 1288.2.

Trial Court Proceedings
On March 13, 2009, BWM filed a petition in the pending superior court action to confirm the award. On April 1, BWM submitted a proposed judgment confirming the award, representing that Kors had not responded and the time within which she was required to do so had expired. (See § 1290.6.) After disallowing Kors's response, the court signed the judgment, which was thereafter entered. However, on May 22, the court vacated the judgment on the ground that BWM had failed to serve Kors notice of a hearing on its petition to confirm, as required by section 1290.4.
*132 The parties filed briefs on BWM's renewed petition to confirm and Kors's request to vacate or correct the award. Though she also raised other issues,[5] Kors's request to vacate rested primarily on the chief arbitrator's asserted failure to disclose "matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial," as required by section 1281.9, subdivision (a).[6] Kors also relied upon section 1286.2, subdivision (a)(6)(A), which, as material, provides that "the court shall vacate the award if the court determines [that] [¶] . . . [¶] (6) An arbitrator making the award . . . (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware . . . ."
Kors's nondisclosure claim is based upon information her counsel obtained shortly after issuance of the arbitration award. In April 2009, while reading the recent opinion of the Supreme Court in Schatz v. Allen Matkins Leck Gamble & Mallory LLP (2009) 45 Cal.4th 557 [87 Cal.Rptr.3d 700, 198 P.3d 1109] (Schatz), Kors's counsel "fortuitously" noticed that SeLegue, the chief arbitrator, was counsel for the defendant law firm in Schatz, which was challenging the denial of its petition to compel arbitration of a fee dispute with a client. Making further inquiry, Kors's counsel learned that SeLegue had been counsel in Schatz for that law firm since at least February 2006, and had filed a brief in the Supreme Court shortly before his appointment as chief arbitrator in this case. Shortly after he filed that brief, nine prominent law firms entered the case as amici curiae in behalf of SeLegue's client. SeLegue personally argued the case in the Supreme Court six days after he presided over the arbitration hearing in this case. Kors's counsel also learned that during December 2008, while he was writing the award in this case, SeLegue filed petitions for writs of mandate in behalf of another large law firm, DLA Piper US, LLP, in an action against it for attorney malpractice and related torts.
As an exhibit to her request to vacate the arbitration award, Kors produced a description of SeLegue's legal practice set forth on his law firm's Web page. The description states, among other things, that "[a]ttorneys who face charges of misconduct . . . often turn to Mr. SeLegue and his colleagues . . .," and that "[h]is business litigation background and extensive experience with the unique issues and dynamics involved in claims against lawyers allow him to provide effective representation of his clients, which include some of the nation's largest law firms."
*133 BWM's response to Kors's nondisclosure claim was twofold. First, it emphasized that, as stated in Moncharsh v. Heily & Blase (1992) 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899] and other cases, "arbitration awards are generally immune from judicial review." (Id. at p. 11.) Secondly, with respect to Kors's claim that vacation is statutorily authorized by section 1286.2, subdivision (a)(6)(A), where, as here, the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware . . .," BWM argued that "[i]t is Dr. Kors'[s] burden to prove her claim of bias" (citing Reed v. Mutual Service Corp. (2003) 106 Cal.App.4th 1359, 1370-1371 [131 Cal.Rptr.2d 524]), and she could not sustain it. BWM's brief maintained that SeLegue's failure "to disclose that he was representing a prominent law firm in an attorney-client fee arbitration dispute" cannot, "under any stretch of the imagination, be considered a matter for disclosure" in this case. "Essentially," BWM argued to the trial court, "Dr. Kors'[s] claim reduces to nothing more than an argument that any attorney who represents law firms should be considered biased in favor of law firms. If accepted, the result would be that all attorneys who represent major law firms are disqualified from arbitrating fee disputes," and "[n]othing in reason or law supports the argument."
Prior to the hearing and on the basis of the briefs, the court issued a tentative ruling granting BWM's petition to confirm and denying Kors's requests to vacate or correct the award. The basis of the rulings, the court explained, is that "[t]he gravamen of CCP sec. 1286.2(a)(6) is a relationship with a party, attorneys [or a] set of facts or specific issues in the case, and there is no such showing here." Additionally, the court stated, section 1286.2, subdivision (a)(1)-(5), requires arbitral misconduct not demonstrated in this case.[7]
After Kors indicated her unwillingness to accept the tentative ruling, a brief hearing was held on July 10, 2009. Kors requested a statement of decision, or at least an oral statement from the bench indicating a judicial determination that the undisclosed mattersi.e., "that the Chief Arbitrator was [at the time of the arbitration] representing a prominent law firm in an attorney-client fee dispute arbitration case before the Supreme Court, and that representation of law firms in disputes with clients is a central feature of his *134 law practice""could cause a person aware of the facts to reasonably entertain a doubt that the [chief arbitrator] would be able to be impartial." (§ 1281.9, subd. (a).) The trial court declined to issue a statement of decision or otherwise make a more specific determination. On July 10, 2009, the court issued an order adopting the tentative ruling. A timely notice of appeal was filed on July 13, 2009.

DISCUSSION
This appeal from the superior court's decision on an award challenged due to the arbitrator's alleged failure to disclose circumstances creating an appearance of partiality presents a mixed question of law and fact. (Haworth v. Superior Court (2010) 50 Cal.4th 372, 384-385 [112 Cal.Rptr.3d 853, 235 P.3d 152] (Haworth).) Our review is de novo. (Ibid.)
(1) Section 1281.9, subdivision (a), imposes on arbitrators a duty to "disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including all of the following: [¶] (1) The existence of any ground specified in Section 170.1 for disqualification of a judge. . . . [¶] (2) Any matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter. [¶] (3) The names of the parties to all prior or pending noncollective bargaining cases in which the proposed neutral arbitrator served or is serving as a party arbitrator for any party to the arbitration proceeding or for a lawyer for a party and the results of each case arbitrated to conclusion . . . . [¶] (4) The names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is serving as neutral arbitrator, and the results of each case arbitrated to conclusion . . . . [¶] (5) Any attorney-client relationship the proposed neutral arbitrator has or had with any party or lawyer for a party to the arbitration proceeding, [¶] (6) Any professional or significant personal relationship the proposed neutral arbitrator or his or her spouse or minor child living in the household has or has had with any party to the arbitration proceeding or lawyer for a party." (Italics added.)
BWM posits two reasons SeLegue had no duty to disclose the matters identified by Kors: first, because those matters do not relate to any of the situations, relationships or other factors enumerated in subdivision (a), subparagraphs (1) through (6), of section 1281.9, and, second, because the premise of Kors's disclosure claim, "that an attorney arbitrator who represents large law firms [in] fee disputes is inherently biased in favor of law *135 firms [engaged in such disputes]," is unreasonable. BWM argues that in relying on the general requirement of disclosure of matters that could raise a reasonable doubt as to impartiality, Kors is attempting to impose a duty of disclosure that was "plainly rejected" by the Legislature.
The trial court accepted the first of these contentions and therefore did not address the second. As indicated above, the court concluded that "[t]he gravamen of CCP sec. 1286.2(a)(6) is a relationship with a party, attorney [or a] set of facts or specific issues in the case, and there is no such showing here. Code of Civil Procedure § 1286.2(a)(1)-(5) require misconduct that is not demonstrated in this case." As we understand this somewhat cloudy explanation, the court agreed with BWM that section 1286.2 provides grounds for vacating an arbitration award for failure to disclose only where the undisclosed matter consists of the relationships with a party or lawyer or other matters specifically described in subparagraphs (1) through (6) of subdivision (a) of section 1281.9. The correctness of this interpretation of the statutes presents a purely legal issue.
BWM assumes that the existence of one or more of the grounds, matters, circumstances or relationships specifically enumerated in subdivision (a)(1)-(6) of section 1281.9 provide the exclusive bases upon which the statutory duty to disclose may be predicated. As BWM states in its brief, SeLegue had no duty to disclose because those provisions of section 1281.9 do not "impose any duty to make disclosures of the subject matter of an arbitrator's prior legal practice." According to BWM, "had the Legislature wished to impose a broad obligation on arbitrators to disclose their activities as counsel, the Legislature would have done so. Instead, the Legislature drew a very clear line in subdivisions (a)(3), (4), and (5). Disclosures are required if the arbitrator has previously represented any of the parties or if he or she has served as an arbitrator in a matter involving the parties or their attorneys. Otherwise, disclosure is not required."
BWM's interpretation of section 1281.9 is certainly not justified by its text, which does no more than include the enumerated factors as "matters that could cause a person aware of the facts to reasonably entertain a doubt about [whether] the proposed neutral arbitrator would be able to be impartial." If the enumerated grounds were exclusive, the duty to disclose would be far more limited than the Legislature obviously intended by requiring disclosure of "all matters" that might cause an informed reasonable person to doubt the arbitrator's ability to be impartial.
*136 (2) Moreover, as courts have noted, subdivision (a)(2) of section 1281.9 specifically requires disclosure of "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter."[8] (See Azteca Construction, Inc. v. ADR Consulting, Inc. (2004) 121 Cal.App.4th 1156, 1162, 1169 [18 Cal.Rptr.3d 142].) Standard 7(d)(14)(A) of the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Standards), requires disclosure of "[a]ny other matter that: [¶] . . . Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial."
(3) This standard "requires a person who is appointed as an arbitrator to disclose any matter even if it is not specifically enumerated in the standard, if it `[m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial.'" (Advantage Medical Services, LLC v. Hoffman (2008) 160 Cal.App.4th 806, 817 [72 Cal.Rptr.3d 935], italics added (AMS).)[9] Our Supreme Court recently confirmed that the general requirement to disclose "any matter that reasonably could create the appearance of partiality" is in addition to the specific disclosure requirements set forth in section 1281.9, subdivision (a)(1) through (a)(6). (Haworth, supra, 50 Cal.4th at p. 381.)
The trial court thus erred in denying Kors's request to vacate the arbitration award on the ground that the only matters required to be disclosed under section 1281.9, subdivision (a), are those expressly enumerated in subparagraphs (1) through (6) of that subdivision.
BWM's alternative argument is that Kors cannot prevail because a person aware that SeLegue's legal practice focused upon the representation of law firms in fee disputes and other litigation with former clients would not reasonably doubt his ability to be impartial in the present fee dispute. BWM first argues that the requirement to disclose "`matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed *137 neutral arbitrator would be able to be impartial' sets the same standard as that set for a sitting judge's mandatory disqualification under section 170.1." From this starting assumption, BWM offers several cases to demonstrate that judges are not bound to disclose matters analogous to those Kors claims SeLegue must disclose: People v. Chatman (2006) 38 Cal.4th 344 [42 Cal.Rptr.3d 621, 133 P.3d 534]; United Farm Workers of America v. Superior Court (1985) 170 Cal.App.3d 97 [216 Cal.Rptr. 4]; and Leland Stanford Junior University v. Superior Court (1985) 173 Cal.App.3d 403 [219 Cal.Rptr. 40].
BWM's starting assumption is supported by the Supreme Court's recent statement that it found "no reason to interpret the appearance-of-partiality rule more broadly in the context of arbitrator disclosure than in the context of judicial recusal." (Haworth, supra, 50 Cal.4th at p. 393.) As we will explain, however, Haworth did not consider factors involved in the present case that highlight fundamental differences between arbitrators and judges. In any event, neither Haworth nor the other cases BWM relies upon involve the sort of circumstances underlying Kors's request for vacation of the award.
Haworth involved arbitration of a female patient's claim that her physician was negligent in performing cosmetic surgery on her lip. The superior court vacated an award in favor of the physician on the ground that the arbitrator failed to disclose a matter that could create a reasonable doubt as to the arbitrator's ability to be impartial under section 1281.9, subdivision (a). The Supreme Court disagreed, holding that the arbitrator, a former judge, was not required to disclose that, "10 years earlier, he received a public censure based upon his conduct toward and statements to court employees, which together created `an overall courtroom environment where discussion of sex and improper ethnic and racial comments were customary.'" (Haworth, supra, 50 Cal.4th at p. 377.) The Haworth court rejected the argument that the arbitrator's censure would cause a person to reasonably conclude the arbitrator might be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery. (Id. at p. 389.) In particular, the court noted that the conduct for which the former judge had been censured occurred some 15 years before the subject arbitration and did not involve litigants or take place while court was in session, and that the fact the former judge was censured rather than removed from office reflected the Supreme Court's view that his conduct did not indicate he could not be fair to female litigants generally. (Id. at p. 390.) Since possible inferences to be drawn from the censured conduct could point either in favor of the female patient or in favor of the male physician, the public censure "simply provides no reasonable basis for a belief that [the former judge] would be inclined to favor one party over the other in the present proceedings." (Id. at p. 391.) Highlighting the importance of a subject matter link between the current arbitration and the matter subject to disclosure, the court noted that "the subject matter of this arbitration was *138 not such that the circumstance of gender was material, or that gender stereotyping was likely to enter into the decision made by the arbitrators" (ibid.) and that, "[h]ad the subject of the arbitration in the present case involved, for example, workplace sexual harassment, we might have come to a different conclusion concerning [the former judge's] obligation to disclose the public censure." (Id. at p. 392, fn. 14.)
In the present case, as we shall explain, the disclosure Kors seeks relates to substantial business relationships involving financial considerations not at issue in Haworth or any of the cases BWM relies upon. Indeed, the financial considerations at issue here could not arise in the judicial arena as they do in the context of private arbitration.
The judicial process is not administered by persons chosen by the parties and paid a fee for the service, but by public officials chosen by a process in which the public participates, whose compensation is at levels that are fixed by law and cannot be affected by their rulings. (See Tumey v. Ohio (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437].) Their job is not to maximize the ends of private parties, nor simply to secure the peace, but to apply the law; and their decisions are almost invariably subject to review for faithfulness to the facts and the mandates of applicable statutes and constitutional principles. Because judicial officers cannot accept a fee for their services, they have no economic interest in potential customers' response to their decisions.
Private arbitration, on the other hand, is a commercial enterprise. Although arbitration can take many forms, arbitrators are usually selected and compensated by the parties to resolve a dispute with a decision not ordinarily subject to judicial review for consistency with the law. Because judicial interference in the merits of an arbitrator's decision is severely restricted (Moncharsh v. Heily & Blase, supra, 3 Cal.4th at pp. 10-11), arbitrators are not required to and often do not base their decisions on strict rules of law (Azteca Construction, Inc. v. ADR Consulting, Inc., supra, 121 Cal.App.4th at p. 1165). Thus, "[t]he United States Supreme Court has observed that `we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.'" (Haworth, supra, 50 Cal.4th at p. 393, quoting Commonwealth Corp. v. Casualty Co. (1968) 393 U.S. 145, 149 [21 L.Ed.2d 301, 89 S.Ct. 337].)
The widespread use in this state of referees and arbitrators selected and paid by the parties in disputes removed from the judicial system has raised issues that have long been recognized and studied, including the danger that the arbitrator's impartiality might be compromised by economic considerations. At the time the present version of section 1281.9 was enacted, concern *139 focused on the increasing use by private corporations and industry associations of standard agreements and contract clauses mandating the private arbitration of future disputes (see Judicial Council of Cal., Alternative Dispute Resolution in Civil Cases: Report of the Task Force on the Quality of Justice, Subcommittee on Alternative Dispute Resolution and the Judicial System (Aug. 1999) p. 33), including mandatory arbitration clauses in attorney retainer agreements (Aguilar v. Lerner (2004) 32 Cal.4th 974, 985 [12 Cal.Rptr.3d 287, 88 P.3d 24]).
This development conferred on arbitrators "such mighty and largely unchecked power" that the Legislature undertook "an increasingly more active role in protecting the fairness of the process." (Azteca Construction, Inc. v. ADR Consulting, Inc., supra, 121 Cal.App.4th at p. 1165.) According to an Assembly committee analysis of the measure that enacted present section 1281.9, the growing use of private arbitrators in California "`has given rise to a largely unregulated private justice industry. While lawyers who act as arbitrators under the judicial arbitration program are required to comply with the Judicial Code of Ethics, arbitrators who act under private contractual arrangements are, surprising to many, currently not required to do so. . . . Because these obligations do not attach to private arbitrators, parties in private arbitrations are not assured of the same ethical standards as they are entitled to in the judicial system.' (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 475 (2001-2002 Reg. Sess.) as amended Aug. 20, 2001, p. 4 . . . .)" (Azteca Construction, Inc. v. ADR Consulting, Inc., at p. 1165, fn. 7.)
One of the ethical problems the Legislature was specifically concerned about was the danger that, like the referees in proceedings authorized by sections 638 and 639,[10] arbitrators' impartiality might be undermined by their economic self-interest. As one commentator pointed out, "[p]ayments to free market referees raise particular concerns insofar as referees may be influenced to decide cases in favor of the party more likely to bring cases to them in the future. To a certain extent, this problem would be solved by the consent requirement, since no one would consent to a reference if he knew the referee would favor his opponent. As a safeguard, however, consent would be effective in protecting the integrity of reference proceedings if all parties had perfect knowledge about all referee decisions. Those parties with the greatest *140 experience with reference, however, would have superior knowledge. Similar parties in other contexts have been called `repeat players,' but under the market conditions that prevail in reference, they might better be termed steady customers. Steady customers represent an important asset to any seller and a referee would find it in his self interest to favor these parties where possible. Of course, any favoritism could not be overt, for then the opponents of the steady customers would refuse to consent. But over time, referees could safely give steady customers the benefit of the doubt more often than not. Steady customers would suspect that their status was giving them a small edge, and this would bring them back into reference for future fights. But their opponents, the one-time customers, would not be aware of the subtle systemic bias working against them. They could not therefore make a fully informed choice when they consented to the reference." (Note, The California Rent-A-Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts (1981) 94 Harv.L.Rev. 1592, 1608, fn. omitted.)
The CAA sought to diminish the advantage steady customers have over one-time customers, and in that manner protect the integrity of private arbitration, by requiring a proposed arbitrator to disclose the prior or pending cases in which he or she served as an arbitrator and the results of the arbitration"including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded, if any." (§ 1281.9, subd. (a)(3), (4).) These financial considerations do not come into play in the judicial system, but they cannot be ignored in the arbitral arena.
The question we must resolve is whether what Kors describes as the chief arbitrator's "active and pervasive representation of law firms in disputes against clients," specifically including his representation during the course of the subject arbitration of the defendant law firm in the attorney fee dispute in Schatz, supra, 45 Cal.4th 557, were "matters that could cause a person aware of the facts to reasonably entertain a doubt that [SeLegue] would be able to be impartial" within the meaning of section 1281.9, subdivision (a). We emphasize that nothing in this opinion is intended to suggest that SeLegue in fact harbors any bias against parties engaged in fee disputes with a former lawyer or law firm. SeLegue is a distinguished lawyer in a highly regarded law firm. We do not assume any actual bias and that issue is not presented. The limited question before us is simply whether the nature of his legal practice, which so far as the record shows focuses upon the representation of lawyers and law firms engaged in fee disputes and other litigation with former clients, "could" cause a person "to reasonably entertain a doubt" that he would be able to impartially arbitrate the instant controversy.
Kors relies heavily upon AMS, supra, 160 Cal.App.4th 806, which upheld the vacation of an arbitrator's award due to failure to disclose business *141 relationships that could cause a reasonable doubt as to the arbitrator's impartiality. In that case, the American Arbitration Association (AAA) designated William J. Tucker, from the law firm Kaye, Rose & Partners, LLP (Kaye Rose), as arbitrator in a binding arbitration proceeding between plaintiff Advantage Medical Services, LLC (AMS), and two defendants. (Id. at pp. 810-811.) Tucker granted AMS's request to have a representative of its insurer present at the arbitration without requiring AMS to first provide identifying information requested by the defendants' attorney. The representative, Cynthia Mitchell, introduced herself at the arbitration as "`"coverage counsel for Lloyd[']s of London."'" Tucker never inquired into the identity of the Lloyd's syndicates Mitchell represented, and made no disclosures regarding any past or present ties he or Kaye Rose had with Mitchell's law firm or with Lloyd's. At the close of the arbitration, Tucker issued an interim award in favor of AMS. (Id. at pp. 811-812.)
A bankruptcy attorney who was then associated in as counsel for the defendants, learned that Tucker and Kaye Rose represented "`"major marine insurers,"'" and that "`Tucker himself is extremely involved in the maritime/insurance defense aspects of his law firm's practice by acting as "correspondent counsel" for P&I [protection and indemnity] Clubs that serve as the vehicle for providing insurance and other services to various types of shipowners.' The P&I Clubs are directly tied to Lloyd's through maritime syndicates that provide the bulk of the insurance and reinsurance for shipowners around the world." (AMS, supra, 160 Cal.App.4th at p. 812.) Tucker refused to disqualify himself, stating that his law firm "`has represented some maritime clients who may have been insured by one or more syndicates who occupy space within the Lloyd[']s of London Building, who underwrite maritime risks'" and "`no syndicate at Lloyd[']s has ever been a client of [Kaye Rose] or of any firm with which I have ever been associated.'" (Ibid.)
After the AAA confirmed Tucker as the arbitrator, the trial court granted Hoffman's petition for an order disqualifying the arbitrator and vacating the award. (AMS, supra, 160 Cal.App.4th at pp. 812-813, 815-816.) The Court of Appeal affirmed, pointing out that there was substantial evidence of Tucker's and Kaye Rose's involvement with Lloyd's, including that two syndicates of Lloyd's that were represented by Mitchell underwrote 75 percent of the AMS employment practices liability insurance policy; eight of the 13 P&I Clubs that comprise Lloyd's International Group had a relationship with Tucker and Kaye Rose; Kaye Rose advertises that it is the approved correspondent counsel for several P&I Clubs and Tucker is the contact person for matters in the San Diego area; participants in the maritime industry "`are all very much aware of each other, of their respective ties to marine insurers and the predominant role Lloyds and its syndicates play with respect to loss prevention and indemnification'"; and "`[i]t would be incompatible for anyone approved as a "correspondent" for a P&I Club to take actions *142 contrary to other participants; to do so would most certainly put at risk their status as approved "correspondent" counsel or otherwise.'" (AMS, at p. 819.) The AMS court found that the foregoing information "`could cause a person aware of the facts to reasonably entertain a doubt that [Tucker] would be able to be impartial,'" and that Tucker failed to disclose it despite his duty to do so under section 1281.9. (160 Cal.App.4th at p. 819.)
BWM maintains AMS is distinguishable because it involved a professional relationship between the arbitrator and a party required to be disclosed under subdivision (a)(6) of section 1281.9,[11] and "Kors makes no showing of any business or professional relationship between the arbitrator and the parties, their counsel, the witnesses, or anyone involved or even remotely interested in the matter." BWM's distinction is in our view superficial.
It is true that the AMS court relied on subdivision (a)(6) of section 1281.9. But it also expressly relied upon Standard 7(d)(14)(A) of the California Rules of Court, which "requires a person who is appointed as an arbitrator to disclose any matter even if it is not specifically enumerated in the standard, if it `[m]ight cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial.'" (AMS, supra, 160 Cal.App.4th at p. 817.) AMS stressed the requirement imposed by section 1281.85, subdivision (a), and Standard 9(a), that an arbitrator "must make a reasonable effort to inform himself or herself of matters that must be disclosed under standards 7 and 8." (Cal. Rules of Court, Std. 9(a); see § 1281.85, subd. (a).) The rationale of AMS is most heavily predicated on the inference that a reasonable person aware of Tucker's and his law firm's business relationships with entities engaged in underwriting insurance and reinsurance, and the "incompatibility" of a person in that commercial network taking action contrary to the interests of other participants, would "reasonably entertain a doubt" about his ability to be impartial as an arbitrator in a dispute in which a representative of one party's insurer attended the arbitration. The crucial factors in AMS were that Tucker was "`extremely involved in the maritime/insurance defense aspects of his law firm's practice'" and that even if, as Tucker asserted, neither he nor his law firm ever represented a syndicate of Lloyd's, "it was `inconceivable that an attorney and firm with such a robust maritime practice could not have ties of some sort to Lloyds.'" (AMS, at p. 818.) Even if Tucker or his law firm never represented a Lloyd's syndicate, Tucker's business relationships nevertheless possessed the qualities that create an impression of possible bias; that is, they were "substantial" relationships that "involve financial consideration." (Michael v. Aetna Life & Casualty Ins. Co. (2001) 88 Cal.App.4th 925, 940 [106 Cal.Rptr.2d 240].)
*143 The case before us presents analogous factors that could cause doubt about SeLegue's ability to be impartial. It is undisputed that SeLegue's legal practice focuses upon the professional responsibility of lawyers and law firms. As stated in his law firm's Web site, SeLegue's "business litigation background and extensive experience with the unique issues and dynamics involved in claims against lawyers allow him to provide effective representation of his clients, which include some of the nation's largest law firms. His experience in defending attorneys, and his deep knowledge of the law governing lawyers, allows him to provide practical solutions to lawyers who face ethical dilemmas." It is also undisputed that at the time he was appointed chief arbitrator, SeLegue was also representing a large law firm in a case before the California Supreme Court involving an attorney fee dispute (Schatz, supra, 45 Cal.4th 557), and that during the arbitration he was also representing another major law firm in an action for attorney malpractice and related torts.
The foregoing facts establish that SeLegue is as "extremely involved" in the defense of lawyers and law firms as Tucker, the arbitrator in AMS, was in maritime defense. Just as it would be "incompatible" for a "correspondent" for entities engaged in underwriting insurance and reinsurance to take actions contrary to other participants in the insurance underwriting industrybecause it "`would most certainly put at risk their status as approved "correspondent" counsel or otherwise'" (AMS, supra, 160 Cal.App.4th at pp. 818-819)so too could a person entertain reasonable doubt whether SeLegue's dependence on business from lawyers and law firms sued by former clients would prevent him from taking the side of a client in a fee dispute with a former law firm, because doing so might "put at risk" his ability to secure business from the lawyers and law firms whose business he solicits.
(4) Contrary to BWM's assertion, Haworth does not mandate affirmance here. As Haworth explained, "`[a]n impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason.' (Betz v. Pankow [(1995)] 31 Cal.App.4th [1503,] 1511 [38 Cal.Rptr.2d 107], italics added.)" (Haworth, supra, 50 Cal.4th at p. 389.) The matter sought to be disclosed in Haworth was remote in time from the current proceeding and did not involve a subject matter linkage such that the conduct sought to be disclosed reasonably indicated bias in favor of a particular party. As we have explained, the situation is entirely different here, where the arbitration concerned an attorney fee dispute and, while acting as arbitrator, SeLegue was engaged in a legal practice focused upon representing lawyers and law firms on issues of professional responsibility and was representing a law firm in a case involving an attorney fee dispute.
*144 The other cases BWM relies upon to argue that SeLegue was not required to disclose these matters also involve completely different circumstances. In People v. Chatman, supra, 38 Cal.4th 344, the judge trying a defendant charged with stabbing a woman to death during a robbery of a photo shop was asked to disqualify himself after he disclosed that 15 years earlier his daughter had been the victim of a robbery at knifepoint in a photo shop. The judge's daughter, an adult at the time, had not been injured, and he had not spoken to her about the incident in over 10 years; the judge represented that he made no connection between the incident and the case before him and felt no bias toward the defendant as a result of his daughter's victimization. (Id. at pp. 360-361.) The defendant also moved to disqualify the judge on the ground that the judge commiserated with the victim's father in the courtroom after the death verdict was rendered. The judge stated that the father had approached him to apologize for his wife's loss of composure during the trial. (Id. at pp. 361-362.) Chatman held that the defendant's allegations "`simply do not support a doubt regarding [the trial judge's] ability to remain impartial.' [Citation.]" (Id. at pp. 363-364.) In the statement BWM finds most relevant, the court observed that judges have "widely varying experiences and backgrounds" and, "[e]xcept perhaps in extreme circumstances, those not directly related to the case or the parties do not disqualify them." (Id. at p. 364.)
In United Farm Workers of America v. Superior Court, supra, 170 Cal.App.3d 97, the plaintiff grower sued the defendant union for damages arising out of union activity during a strike. In the middle of the bench trial, the judge mentioned that during the strike his wife had volunteered for and worked two or three days as a replacement worker in a carrot shed owned by the grower. The union moved to disqualify the judge, contending that the undisclosed facts, and failure to disclose them, would cause a person to reasonably entertain a doubt that the judge would be able to be impartial. The judge represented that he had forgotten about his wife's work for the plaintiff grower until his recollection was refreshed by trial testimony. (Id. at pp. 100-102.) In discussing the factors weighing against disqualification, the Court of Appeal noted that the circumstances at issue did not involve the judge directly but only his wife's activity, there was no continuing relationship between the judge's wife and the grower giving rise to a current personal or financial interest that would disqualify the judge, and the judge's wife was not involved in any of the events at issue in the current lawsuit. (Id. at pp. 105-106.)
In Leland Stanford Junior University v. Superior Court, supra, 173 Cal.App.3d 403, the plaintiff in a lawsuit against Stanford University and others challenging certain physical developments on the university campus *145 successfully sought disqualification of the judge on the basis that 13 years earlier he had been president of the Stanford Law Society for seven years. (Id. at pp. 404-406.) The Court of Appeal held disqualification should not have been granted because "the `average person on the street,' aware of the facts, would find Judge Thompson's activities in and before 1972 both so remote and so unrelated to the management of Stanford's land and physical facilities as to raise no doubt as to Judge Thompson's ability to be impartial in this matter." (Id. at p. 408.)
None of these cases involve anything like the simultaneous representation of clients in the same position as one of the parties to the current arbitration in matters involving the same subject matter. Unlike the cases upon which BWM relies, the disclosure at issue here was of matters that clearly could create a reasonable belief that the arbitrator "`was biased for or against a party for a particular reason.' (Betz v. Pankow, supra, 31 Cal.App.4th at p. 1511, italics added.)" (Haworth, supra, 50 Cal.4th at p. 389.)
(5) In finding "no reason to interpret the appearance-of-partiality rule more broadly in the context of arbitrator disclosure than in the context of judicial recusal" (Haworth, supra, 50 Cal.4th at p. 393), the Supreme Court was considering two arguments: First, that the standard for arbitrator disclosure should be broader than that for judicial recusal in that "all doubts should be resolved in favor of disclosure" and, second, that the disclosure requirement for arbitrators should be based on the party's perspective rather than the perspective of an "`objective, reasonable person.'" (Id. at p. 392.) Haworth rejected these arguments, explaining that the disclosure requirements were intended to ensure the impartiality of the arbitrator, not to mandate disclosure of "all matters that a party might wish to consider in deciding whether to oppose or accept the selection of an arbitrator." (Id. at p. 393.) The interpretation sought in Haworth, the court concluded, would place an unreasonable burden on the arbitrator to "identify and disclose all events in the arbitrator's past, including those not connected to the parties, the facts, or the issues in controversy, that conceivably might cause a party to prefer another arbitrator." (Id. at p. 394.) This would undermine the finality of arbitration awards by subjecting them to "after-the-fact attacks by losing parties searching for potential disqualifying information only after an adverse decision has been made." (Id. at pp. 394-395.)
These problems are not presented here. Kors is not seeking disclosure of all matters that might make her prefer a different arbitrator or asking us to depart from the standard of an objective person. Her contention is simply that an objective person could reasonably question the impartiality of an arbitrator *146 in a dispute over legal fees who, at the time of the arbitration, was engaged generally in the defense of attorneys and law firms in cases involving professional responsibility and was actively representing a law firm in a case before the California Supreme Court involving a dispute over legal fees. To the extent the disclosure sought here is "broader" than what would be required of a judge, it is because the circumstances here could not arise in the judicial arena, where a sitting judge could not simultaneously represent parties of the same class as one of the parties to the litigation.
(6) We are mindful that "`"ordinary and insubstantial business dealings"' arising from participation in the business or legal community do not necessarily require disclosure." (Luce, Forward, Hamilton & Scripps, LLP v. Koch (2008) 162 Cal.App.4th 720, 733 [75 Cal.Rptr.3d 869], quoting Guseinov v. Burns (2006) 145 Cal.App.4th 944, 959 [51 Cal.Rptr.3d 903].) So, too, do we recognize that arbitrators "cannot sever all their ties [to] the business world." (Ceriale v. AMCO Ins. Co. (1996) 48 Cal.App.4th 500, 505 [55 Cal.Rptr.2d 685].) "Because arbitrators are selected for their familiarity with the type of business dispute involved, they are not expected to be entirely without business contacts in the particular field." (Ray Wilson Co. v. Anaheim Memorial Hospital Assn. (1985) 166 Cal.App.3d 1081, 1087-1088 [213 Cal.Rptr. 62], disapproved of on another ground in Moncharsh v. Heily & Blase, supra, 3 Cal.4th at pp. 27-28.) However, to the extent these relationships are substantial and involve financial considerations creating an impression of possible bias, they must be disclosed. Like the Supreme Court, "[w]e can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." (Commonwealth Corp. v. Casualty Co., supra, 393 U.S. at p. 149.)
(7) For the foregoing reasons, we conclude that upon his appointment SeLegue had a duty to timely disclose to the parties the nature of his legal practice, including the fact that he was then representing a law firm engaged in a fee dispute with a former client. An arbitrator's failure to disclose facts as required by section 1281.9 warrants vacation of his or her award. (§ 1286.2, subd. (a)(2), (6); Casden Park La Brea Retail LLC v. Ross Dress for Less, Inc. (2008) 162 Cal.App.4th 468, 476-477 [75 Cal.Rptr.3d 763]; Michael v. Aetna Life & Casualty Ins. Co., supra, 88 Cal.App.4th at pp. 937-938.) As stated in Ovitz v. Schulman (2005) 133 Cal.App.4th 830 [35 Cal.Rptr.3d 117], "the statute leaves no room for discretion. (8) If a statutory ground for vacating the award exists, the trial court must vacate the award." (Id. at p. 845, italics added; accord, Guseinov v. Burns, supra, 145 Cal.App.4th at p. 957; International Alliance of Theatrical Stage Employees, etc. v. Laughon (2004) 118 Cal.App.4th 1380, 1386-1387 [14 Cal.Rptr.3d 341].)

*147 DISPOSITION
The trial court order granting BWM's petition to confirm the arbitration award and denying Kors's petition to vacate the award is reversed as to both rulings. The case is remanded to the superior court with directions to grant Kors's motion to vacate the arbitration award and consider any request by the parties to take further action not inconsistent with this opinion.
Haerle, J., and Richman, J., concurred.
NOTES
[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.
[2] Kors moved for an award of attorney fees for prevailing on her motion to compel arbitration, but the motion was denied.
[3] Under the BASF rules, arbitrators are selected by the chair of the Attorney Fee Dispute Executive Committee (BASF rule 1(B)) from a list maintained by the committee "based upon relevant factors including availability; experience; complexity of the case; and any Client request . . . for an Arbitrator who practices civil or criminal law." (BASF rule 7(A).) The rules also provide that "[i]n cases in which the amount in controversy is $10,000 or more, and the Client has agreed to Binding Arbitration, a Panel of three (3) Arbitrators shall be appointed to hear the case, one of which is not an attorney. Notwithstanding the amount in controversy, the parties may agree to have the matter heard by one (1) Arbitrator. That Arbitrator shall be an attorney." (BASF rule 7(B)(2).) In all cases assigned to a three-member panel, BASF staff "shall appoint one (1) Attorney member as Chief Arbitrator. The Chief Arbitrator shall have an equal vote with the other members of the Panel but shall be responsible for the conduct of the Arbitration and the writing of the Arbitration Award." (BASF rule 7(D).)
[4] The panel thus concluded that the amount of fees and costs that should have been charged Kors was exactly the amount BWM claimed: $306,749.22. The panel reduced that amount to $303,579.34 only because Federal Express and Westlaw charges in the respective amounts of $55.88 and $3,114 were deducted from the amount of the award.
[5] Namely, that the arbitrators (1) delayed the arbitration award for 175 days, far beyond the "objective" of the BASF rules that the award issue no later than 45 days after the matter is submitted; (2) improperly refused to hear material evidence; and (3) "failed to address the pertinent issues."
[6] The grounds for correcting an arbitration award and the applicable conditions are set forth in sections 1286.6 and 1286.8.
[7] Subdivisions (a)(1) through (5) of section 1286.2 require vacation of an arbitration award where "(1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators, [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title."
[8] The standards were adopted by the Judicial Council pursuant to section 1281.85, which provides that the standards "shall be consistent with the standards established for arbitrators in the judicial arbitration program and may expand but may not limit the disclosure and disqualification requirements established by this chapter. The standards shall address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships." (§ 1281.85, subd. (a).)
[9] The comment to Standard 7 explains: "While the remaining subparagraphs of (d) require the disclosure of specific interests, relationships, or affiliations, these are only examples of common matters that could cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial. The absence of the particular interests, relationships, or affiliations listed in the subparagraphs does not necessarily mean that there is no matter that could reasonably raise a question about the arbitrator's ability to be impartial and that therefore must be disclosed." (Cal. Rules of Court, com. to Std. 7.)
[10] Section 638 provides in relevant part that "[a] referee may be appointed upon the agreement of the parties filed with the clerk, or judge, or entered in the minutes, or upon the motion of a party to a written contract or lease that provides that any controversy arising therefrom shall be heard by a referee if the court finds a reference agreement exists between the parties . . . ." Section 639 provides, among other things, that on the motion of a party or on its own motion, the court may appoint a referee in certain cases even if the parties do not agree. The fees of referees authorized by sections 638 and 639 are ordinarily paid by the parties. (See § 645.1.)
[11] As material, subdivision (a)(6) of section 1281.9 requires disclosure of "[a]ny professional or significant personal relationship the proposed neutral arbitrator . . . has or has had with any party to the arbitration proceeding or lawyer for a party."